Carolyn Gilbert, WSBA No. 51285
Joseph P. Cutler, WSBA No. 37234
Reina Almon-Griffin, WSBA No. 54651
Jane E. Carmody, WSBA No. 55409
Roxanne Degens, WSBA No. 57351
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email: JCutler@perkinscoie.com
        CarolynGilbert@perkinscoie.com
        RAlmon-Griffin@perkinscoie.com
        JCarmody@perkinscoie.com
        RDegens@perkinscoie.com


Antoinette M. Davis, WSBA No. 29821
Nancy Talner, WSBA No. 11196
Crystal Pardue, WSBA No. 54371
**American Civil Liberties Union of
Washington Foundation**
P.O. Box 2728
Seattle, WA 98111
Telephone:  206.624.2184
Email: talner@aclu-wa.org
        tdavis@aclu-wa.org
        cpardue@aclu-wa.org

*Attorneys for Plaintiffs Selah Alliance for
Equality, et al.*

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –1

152339617.1

1
2
3
4
5
6
7

THE HONORABLE JUDGE ROSANNA M. PETERSON

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

8

9  SELAH ALLIANCE FOR
   EQUALITY, COURTNEY
10 HERNANDEZ, REV. DONALD
   DAVIS JR., LAURA PEREZ,
11 ANITA CALLAHAN, KALAH
   JAMES, CHARLOTTE TOWN,
12 AMANDA WATSON, and ANNA
   WHITLOCK,
13
              Plaintiffs,
14
       v.
15
   CITY OF SELAH; SHERRY
16 RAYMOND, in her official capacity
   as Mayor of the City of Selah; and
17 DONALD WAYMAN, in his
   official capacity as City
18 Administrator for the City of Selah,

19            Defendants.

20

No. 1:20-cv-03228

**MOTION FOR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**06/04/2021**
**With Oral Argument: 1:30 p.m.**
**Via videoconference**

21                      **I.  INTRODUCTION**

22       This lawsuit has caused the City of Selah to double down on its efforts to

23  silence its citizens. Until recently, the City, in practice, allowed "freestanding signs"

24  in public right-of-ways, subject to an unequally-enforced permit process described

25  in Selah Municipal Code ("SMC") 10.38.040. Recently, during a conference with

26  counsel to the City, the undersigned counsel raised a concern that the City had, after

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –2

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

a period of restraint, resumed the removal of S.A.F.E. signs from public right-of-ways. In that conference, Defendants' counsel revealed that the City has stopped issuing permits altogether, and has decided to remove **all** "freestanding signs" from public property, regardless of the signs' content. The City cited SMC 10.38.100, stating that it prohibits **any** "freestanding sign" placed in a public right-of-way. The City has in fact begun removing all signs from Selah's right-of-ways pursuant to SMC 10.38.100, including Selah Alliance for Equality ("S.A.F.E.") signs. While this new action by the City may be "content neutral," it is likely even more unconstitutional than the original behavior described in Plaintiffs' complaint.[1]

Plaintiffs S.A.F.E., Courtney Hernandez, Rev. Donald Davis Jr., Laura Perez, Anita Callahan, Kallah James, Charlotte Town, Amanda Watson, and Anna Whitlock (collectively, "Plaintiffs") therefore ask that this Court preliminarily enjoin enforcement of three provisions of the City's sign regulations that are facially unconstitutional, as laid out in Plaintiff's Complaint, including: (1) SMC 10.38.100, which the City purports bans all "freestanding signs" from all public property ("Public Sign Ban"); (2) SMC 10.38.040, the City's permit application process, which the City has abused and enforced unconstitutionally and unequally ("Permit Process"); and (3) SMC 10.38.050, which treats signs with different messages differently ("Political Sign Regulation").  Specifically, Plaintiffs request that the Court enjoin the City from removing signs (including S.A.F.E. signs) from public right-of-ways until this dispute is either resolved or the City revises its sign code to conform to the United States and Washington constitutions.

---

[1] Plaintiffs have filed a Motion for leave to Amend their Complaint to address Defendants' recent actions. Plaintiffs' First Amended Complaint asserts that SMC 10.38.100 is facially unconstitutional.

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –3

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

1
2
3
4
5
6
7
8
9
10

    Plaintiffs are likely to succeed on the merits of their claims that these provisions of Selah's sign regulations facially violate the First Amendment and Article 5, Section I of the Washington State Constitution. S.A.F.E. continues to be injured by the removal of its signs and silencing of its speech. The balance of equities and public interest both support preliminary relief, given that the entire City of Selah has now lost its right to speak on all matters—including political matters and other matters of public importance, which are accorded the highest rung of constitutional protection—through the use of freestanding signs in traditional public forums. Citizens' free speech rights are being chilled daily. Thus, there is a need for immediate injunctive relief without further delay.

## II. STATEMENT OF FACTS

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

    Beginning in August 2020, members of S.A.F.E. placed temporary signs in public areas conveying support for the Black Lives Matter movement and displaying messages such as "Hate has no place in Selah" and "Support Equality for All." *See* Whitlock Decl. ISO Pls.' Mot. Prelim. Inj. ("Whitlock Decl.") at ¶ 12; Exs. A & B; Pls.' First Amend. Compl. ("FAC") at ¶ 41. Other S.A.F.E. signs called for the termination of Defendant Donald Wayman as City Administrator, FAC at ¶ 41, who had been openly hostile to the Black Lives Matter movement. *See, e.g.*, Ex. C at 2, 4 (Defendant Wayman stating that the Black Lives Matter movement is "communist indoctrination"); City of Selah, *June 24, 2020 Selah Council Meeting Special Session*, YOUTUBE (June 25, 2020), https://www.youtube.com/watch?v=j7Schq2FhpM&t=2087s (at 00:35:00) (Defendant Wayman calling the Black Lives Matter movement "devoid of intellect and reason," a "left wing mob," and "neomarxist"). Some signs advertised public events discussing these important social and political issues. *See* FAC at ¶ 41. The S.A.F.E. signs were placed alongside numerous other temporary signs promoting

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

political candidates, local businesses, civic events, and garage sales. Whitlock Decl. ¶ 13; *see* Exs. A & B (photos of S.A.F.E. signs placed alongside signs advertising a political candidate on 1st Street in Selah). These other signs had been in place for weeks before S.A.F.E. posted its signs. *See* Whitlock Decl. ¶ 13; City of Selah, *October 13, 2020 Selah Council Study Session and Meeting*, YOUTUBE (Oct. 13, 2020), https://www.youtube.com/watch?v=2AK9bsUtkw8 (at 1:51:00–2:02:00) (Councilmember Suzanne Vargas stating that non-S.A.F.E. signs remain on the "main street" for "days in a row" and Councilmember Carlson stating that non-S.A.F.E. signs are up for "months" and not removed).

Immediately after S.A.F.E. put up its signs, Defendant Wayman, in his official capacity as City Administrator, confiscated the S.A.F.E. signs. Ex. D (video of Defendant Wayman removing S.A.F.E.'s signs, while leaving other signs in place). Defendant Raymond has also confiscated S.A.F.E.'s signs, in her official capacity as Mayor. *See October 13, 2020 Selah Council Study Session and Meeting* at 1:54:00–1:56:00 (Defendant Wayman stating that he and Defendant Raymond confiscated the signs). During a public City Council meeting on October 13, 2020, Defendant Wayman stated that they would continue to do so. *Id.* Defendant Wayman also encouraged private citizens to remove S.A.F.E.'s signs at this City Council meeting, advising that "the signs being taken and disposed of by any person or entity is not illegal, and not theft, and it is equivalent to picking up litter." *Id.* Private citizens have heeded this advice. *See* Daniel Callahan, *Sign Thief pt1*, YOUTUBE (Jan. 5, 2021) https://www.youtube.com/watch?v=B-NwH2YCPhw (private citizen stealing S.A.F.E. sign and stating that the "Selah City Administrator" told her the signs are "litter" and that she has a legal right to confiscate the signs).

Initially, the City removed S.A.F.E.'s signs because they did not qualify as "political signs" pursuant to SMC 10.83.050, and therefore were not among those

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –5

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

categories of signs exempt from the Permit Process. *See* SMC 10.38.040 (permit requirement); SMC 10.30.050(1) (exemption for political signs); Whitlock Decl. ¶¶ 14, 18; *see also* Ex. E. The Permit Process prohibits *any* sign from being erected in the City (whether on public or private property) without a permit from the "building official," who is appointed by the Mayor of Selah. SMC 10.38.040; SMC 11.04.010; SMC 10.38.030. The Permit Process does not state who the "building official" is, nor is it readily apparent from the Selah City website.[2] The Permit Process contains no criteria for determining when a permit should or should not be issued. When Plaintiffs asked the City how to obtain a permit, they were told that "political signs" did not need a permit, even when they are placed on public property. Whitlock Decl., Attach. C.

Defendants applied SMC 10.38 unequally towards S.A.F.E.'s signs. S.A.F.E.'s signs have been repeatedly removed by Defendants, while other signs in the same public areas that violate SMC 10.38 have been left untouched. Residents of Selah have a history of posting signs of many types (business signs, yard sale signs, event announcements, and directional signs) on public property without first obtaining the permits required by SMC 10.38.040; and those signs are not removed by City personnel nor by private citizens with any regularity. *See* Whitlock Decl. at ¶ 13 Attach. C; *October 13, 2020 Selah Council Study Session and Meeting* at 1:54:00–2:09:40 (Councilmembers Carlson and Vargas raising unequal sign enforcement concerns). Statements by City officials have made it clear that the City neither welcomes nor tolerate S.A.F.E.'s messages of equality, support of the Black Lives Matter movement, or messages calling for Defendant Wayman's removal. *See*

---

[2] On information and belief, the building official is "Jeff Peters," who is listed as the "City Planner" on the City website. Ex. F.

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –6

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

*June 24, 2020 Selah Council Meeting Special Session* at 00:35:00 (Defendant Wayman calling the Black Lives Matter "devoid of intellect and reason," a "left wing mob," "neomarxist," and promising that he would "protect the City from the mayhem and evil" of the Black Lives Matter movement); Ex. G (Defendant Wayman, commenting on chalk art in support of the Black Lives Matter movement, stating "we don't believe city property is the appropriate place for expressing your artistic tendencies or your political speech"); Ex. H (councilmember Wickenhagen stating "BLM policies fall well into Neo-Marxist philosophy"); Ex. I (Defendant Raymond stating "Mr. Wayman continues to have my full support as our City Administrator. His personal political views are his own."); *October 13, 2020 Selah Council Study Session and Meeting* at 1:51:00–2:02:00 (Defendant Raymond stating, "how would you like it if someone put signs up with your name all over town" and calling S.A.F.E.'s signs "slander").

The City's suppression of messages in support of the Black Lives Matter movement has not been limited to S.A.F.E.'s signs—the City has also repeatedly removed chalk art and limited public comments[3] at City Council meetings related to the Black Lives Matter movement and racial equality. Exs. G, J, K; *see* Callahan Decl. ISO Pls.' Mot. Prelim. Inj. ("Callahan Decl.") at ¶ 7. The City has even threatened to criminally prosecute individuals for said chalk art. Exs. J & K; *see also* Ex. L at 2 (City Attorney stating "As I have repeatedly said . . . prosecution will eventually occur if people choose to violate the law despite numerous warnings").

Plaintiffs brought this suit challenging SMC 10.38 as facially violative of the First Amendment and Article I, Section 5 of the Washington Constitution. *See*

---

[3] During the height of the chalk art dispute, the City temporarily eliminated its City Council meetings where the public could submit comments altogether. *See* Ex. M.

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –7

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

*generally* ECF No. 1. Plaintiffs also challenged Defendants unequal treatment of signs placed in public spaces and Defendants' retaliation toward Plaintiffs, which also violates Plaintiffs' free speech rights. *Id.*

In pre-litigation correspondence between Plaintiffs and the City, the City assured Plaintiffs that "the city's Public Works personnel and Mr. Wayman have been instructed not to take any action for the time being with regard to the supposedly 'political' signs that members of the so-called SAFE group have installed in the city rights of way." Ex. L at 1. The City Attorney Mr. Case assured Plaintiffs that "[n]ow that constitutional objections have been raised, all city employees—including Mr. Wayman—are leaving the signs alone for the time being[.]" *Id.* at 1–2. Plaintiffs, relying on these assurances, elected not to file a Motion for a Temporary Restraining order or for a Preliminary Injunction when they first filed this lawsuit. Cutler Decl. ISO Pls.' Mot. to Am. Compl. ("Cutler Decl.") at ¶ 6.

The City has now changed its tune and has begun confiscating S.A.F.E.'s signs once again. Although the City initially removed S.A.F.E.'s signs because they had not received permits and did not qualify as exempt "political signs" pursuant to SMC 10.83.050, the City now cites a *different* provision of SMC 10.38 to justify its removal of S.A.F.E.'s signs. It now considers S.A.F.E. signs to be governed by the regulations of "freestanding" signs instead of "political signs" and now argues that its municipal code prohibits all "freestanding signs" in public right-of-ways. *See* SMC 10.38.100; Cutler Decl. at ¶ 5. The City has abandoned its Permit Process altogether, *see* SMC 10.38.040, and has begun removing *all* signs from Selah's right-of-ways, including S.A.F.E.'s signs, which significantly widens the scope of constitutional harm resultant from Defendants' continued disregard for Selah citizens' expressive freedoms. *See* Cutler Decl. at ¶ 5.

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –8

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

To date, Defendants have not accounted for the signs that they have taken nor have they compensated S.A.F.E. for any signs confiscated and not returned to S.A.F.E.  Whitlock Decl. at ¶ 26. S.A.F.E. has spent $4,209.47 to date on 650 signs and approximately 400 signs have been taken. *Id.*

### III. LEGAL STANDARD

An injunction is an equitable remedy. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 3 (2008); *see also Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984) ("The grant of a preliminary injunction is a matter committed to the discretion of the trial judge[.]"). A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (the "Winter Factors").

### IV. ARGUMENT

A preliminary injunction is both necessary and appropriate because (1) Plaintiffs are likely to succeed on the merits of their claims; (2) Plaintiffs are currently suffering and will continue to suffer irreparable harm in the form of the loss of their right to constitutionally-protected free speech; (3) the balance of equities tips sharply in favor of Plaintiffs; and (4) the public interest favors issuance of an injunction pending final resolution of this action.

**A.    Plaintiffs are Likely to Succeed on the Merits of Their Claims.**

Plaintiffs prevail on the first *Winter* factor—likelihood of success on the merits—which is generally considered the "most important." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Even though Plaintiffs are likely to succeed on the merits of all of their claims, in order to prevail on the first *Winter* factor Plaintiffs need only demonstrate the likelihood of success on the merits for at

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

least one claim. *Rackwise, Inc. v. Archbold*, No. 2:17-cv-0797-WBS-CKD, 2017 WL 2547040, at *3 (E.D. Cal. June 13, 2017). As shown by even the limited evidence available without discovery, Plaintiffs are likely to succeed on the merits of counts IV and I because SMC 10.38 facially violates the Washington and U.S. Constitutions. Although the City has changed its interpretation of SMC 10.38 and enforcement of the same throughout this litigation, *see* Cutler Decl, ¶ 5, Plaintiffs will prevail under *any* reasonable interpretation of SMC 10.38.[4]

### 1.      The Political Sign Regulation (SMC 10.38.050) is Unconstitutional

Under the First Amendment, speech in a public forum may be constitutionally restricted by content-neutral regulations based on the "time, place, and manner of expression" that are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988); *United States v. Grace*, 461 U.S. 171, 177 (1983). "Greater protection" is afforded under Article I, Section 5 of the Washington Constitution: time, place, and manner restrictions may only be imposed "upon the showing of a 'compelling state interest,' rather than the 'substantial governmental interest' that is sufficient under the First Amendment." *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wash. 2d 789, 800–01 (2010). Political speech is afforded special protection and is "subject to the most rigorous scrutiny." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 n.5 (1985).

---

[4] At this time, in requesting preliminary relief, Plaintiffs only ask the Court to determine whether SMC 10.38 is *facially* unconstitutional and are not at this time asking the Court to rule on Plaintiffs' as-applied and selective enforcement claims.

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –10

152263600.1
152339617.1

1  The City's Political Sign Regulation treats political speech differently than

2  signs containing non-political speech, regulates speech in a public forum, is content-

3  based, is not narrowly tailored to serve a compelling government interest, and given

4  how the City has limited public comments in City Council meetings, erased and

5  threatened to prosecute chalk art, and otherwise limited gatherings to vocally protest,

6  the City fails to leave open ample alternative channels of communication. For these

7  reasons, the Political Sign Regulation is unconstitutional.

### a.    The Political Sign Regulation Burdens Political Speech and Speech Regarding Matters of Public Concern

10  The Political Sign Regulation burdens the political speech of all Selah citizens

11  because it prohibits all signs on public property—including "political signs"—unless

12  a permit is obtained (and the City has apparently stopped issuing permits altogether).

13  SMC 10.38.040–.050 (only "political signs" on private property are exempt from the

14  permit requirement). Both Article I, Section 5 of the Washington Constitution and

15  the First Amendment provide heightened protection to political speech, "giving it

16  greater protection over other forms of speech." *Collier v. City of Tacoma*, 121 Wash.

17  2d 737, 746 (1993) (citing *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

18  Consequently, the Political Sign Regulation is "subject to strict scrutiny, which

19  requires the Government to prove that the restriction furthers a compelling interest

20  and is narrowly tailored to achieve that interest." *Citizens United v. Fed. Election

21  Comm'n*, 558 U.S. 310, 340 (2010) (internal quotation marks omitted); *see Fed.

22  Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 256 (1986).

23  Further, the Political Sign Regulation burdens S.A.F.E.'s signs, which relate

24  to "matters of public concern." This type of speech is "at the heart of the First

25  Amendment's protection" and therefore accorded heightened protection. *See Snyder

26  v. Phelps*, 562 U.S. 443, 451–52 (2011). The First Amendment reflects "a profound

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –11

152263600.1
152339617.1

national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks and citations omitted). Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]" *Snyder*, 562 U.S. at 453 (citing *Connick*, 461 U.S. at 146) (citation omitted); *see Janus v. Am. Fed'n of State*, *Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (characterizing "controversial subjects" such as climate change, evolution, sexual orientation and gender identity, and religion as "sensitive political topics" subject to heightened First Amendment protection).

S.A.F.E.'s signs unquestionably relate to matters of public concern—a fact made obvious by the significant controversy, press coverage, and conversation S.A.F.E.'s signs have sparked. *See* Ex. O. S.A.F.E.'s signs opposing city officials like City Administrator Wayman speak to matters of local concern in Selah, and they, too, sit at the heart of political speech and the First Amendment; they animate and reflect life in a community like Selah. Therefore, any regulation that restricts Plaintiffs' ability to place these signs is subject to heightened scrutiny.

### b.    Parking Strips are Public Forums

The Political Sign Regulation regulates speech in a traditional public forum. Plaintiffs placed their signs in the grassy strip between the public sidewalk and street,

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –12

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

Whitlock Decl. at ¶ 12. This area, referred to as a "parking strip," has been recognized as a traditional public forum. *Collier*, 121 Wash. 2d at 747. Public streets and parks are also traditional public fora. *See Bledsoe v. Ferry Cty., Washington*, No. 2:19-cv-0227-RMP, 2020 WL 376611, at *3 (E.D. Wash. Jan. 23, 2020) (citing *Haugue v. CIO*, 307 U.S. 496, 515 (1939); *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)). The intersections of arterial streets are also considered traditional public forums. *City of Lakewood v. Willis*, 186 Wash. 2d 210, 220–21 (2016) (en banc) "Public fora . . . have immemorially been held in trust for the use of the public, and . . . have been used for purposes of assembly, communicating thoughts between citizens and discussing public questions." *Bledsoe*, 2020 WL 376611 at *3 (citations omitted). These traditional public forums "occupy a special position in terms of First Amendment protection," and the government's ability to restrict speech within them is "very limited." *Collier*, 121 Wash. 2d at 747 (citation omitted).

### c.    The Political Sign Regulation is Content-Based

The Political Sign Regulation is content-based, and thus, presumptively unconstitutional. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (finding that content-based laws are presumptively unconstitutional and must be narrowly tailored to serve compelling state interests). Content-based regulations "distinguish[] between permissible and impermissible signs at a particular location by reference to content." *Collier*, 121 Wash. 2d at 749 (citing *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 516–17 (1981)); *see also FCC v. League of Women Voters of Calif.*, 468 U.S. 364, 383–84 (1984). Even viewpoint-neutral regulations are content-based if they distinguish based on subject matter—that is, "entire subjects of expression[,]" including politics. *Collier*, 121 Wash. 2d at 749; *see Reed*, 576 U.S. at 169 ("[A] law banning the use of sound trucks for political speech—and only political speech—

would be a content-based regulation, even if it imposed no limits on the political viewpoints").

Under the Political Sign Regulation, whether a sign may be posted on public property without a permit depends on the subject matter of the sign. For example, banners advertising grand openings may be posted without a permit on public property, SMC 10.38.050(5), but political signs must receive a permit to be posted on public property. SMC 10.38.040–.050(1). Therefore, the Political Sign Regulation is content-based and presumptively unconstitutional. *See Reed*, 576 U.S. at 163.

### d.   The Political Sign Regulation is Not Narrowly Tailored to Serve a Government Interest

The City bears the burden to show that the Political Sign Regulation furthers a compelling interest and is narrowly tailored to that end. *Ino Ino, Inc. v. City of Bellevue*, 132 Wash. 3d 103, 117 (1997); *see Hill v. Colorado*, 530 U.S. 703, 725 (2000); "To constitute a compelling interest, the purpose must be a fundamental one and the legislation must bear a reasonable relation to the achievement of the purpose." *Collier*, 121 Wash. 2d at 754. The regulation also must be "narrowly tailored" to advance the City's interest, meaning the regulation must not "burden substantially more speech than is necessary to further the government's asserted interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014) (citation omitted).

The language of the challenged code itself determines what interests the City purports to advance by restricting speech. SMC 10.38's stated purpose is "to accommodate and promote sign placement consistent with the character and intent of the individual zoning districts; ensure proper sign maintenance; elimination of visual clutter; and the promotion of creative and innovative sign design." SMC 10.38.020.

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –14

152263600.1
152339617.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Although aesthetics has been determined to be a "significant" governmental interest, it is not an interest "sufficiently ***compelling*** to justify restrictions on political speech in a public forum." *Collier*, 121 Wash. 2d at 754 (emphasis added) (citing *Members of the City Coun. of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984)); *see also Reed*, 576 U.S. at 171–72 (assuming arguendo that aesthetic and safety concerns constitute "compelling governmental interests" and concluding that a regulation that distinguished between temporary directional signs and ideological signs advanced neither goal because neither presented a greater aesthetic or safety threat). Aesthetic interests "require careful scrutiny when weighed against free speech interests because their subjective nature creates a high risk of impermissible speech restrictions." *Collier*, 121 Wash. 2d at 752. Aesthetic interests alone are particularly problematic when weighed against the importance of political speech, given the "preferred importance" of political speech. *Id.* at 758; *see id.* ("Before the city may impose durational limits or other restrictions on political speech to advance aesthetic interests, it must show that it is seriously and comprehensively addressing aesthetic concerns with respect to its environment.").

In addition, despite contending that the Political Sign Regulation serves aesthetic goals, the Regulation allows commercial banners to be posted on public property without a permit. These signs are no more aesthetically pleasing than political signs. *Metromedia*, 453 U.S. at 508–10; *Collier*, 121 Wash. 2d at 752. By exempting some speech from the general restriction, the City "diminish[es] the credibility of [its] rationale for restricting speech in the first place." *World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 685 (9th Cir. 2010) (citing *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir. 2009)). The City "denigrates its interest in . . . beauty and defeats its own case by permitting" other types of signs. *Id.*

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –15

152263600.1
152339617.1

1   Washington courts have found that ordinances that distinguished between
2   commercial and noncommercial speech yet purported to advance aesthetic interests
3   (like the Political Sign Regulation) were not narrowly tailored because "that
4   distinction does not bear any relationship to . . . interests in aesthetics[.]" *Kitsap*
5   *County v. Mattress Outlet/Gould*, 153 Wash. 2d 506, 514 (2005); *see Ballen v. City*
6   *of Redmond*, 466 F.3d 736, 743 (9th Cir. 2006) ("Different signs are treated
7   differently under the Ordinance based entirely on a sign's content. The City has
8   failed to show how the exempted signs reduce vehicular and pedestrian safety or
9   besmirch community aesthetics any less than the prohibited signs."); *see also, e.g.*,
10  *Reed*, 576 U.S. at 171–72 (reasoning that the banned signs were "no greater an
11  eyesore" than non-banned signs, and thus the regulation was not narrowly tailored
12  to meet the regulation's stated purpose). For the same reasons, the Political Sign
13  Regulation is not narrowly tailored.

14  Perhaps most tellingly, the City has admittedly only recently begun enforcing
15  the Political Sign Regulation, *after it became embroiled in the present dispute*,
16  indicating that aesthetics are not an important interest to Selah; at least not until the
17  City needed a convenient justification to remove S.A.F.E.'s signs. Whitlock Decl.,
18  Attach. C (stating that political signs did not need a permit to be on public property);
19  Ex. L (letter from City Attorney stating that they would not remove S.A.F.E.'s signs
20  or political candidate signs prior to the election); City of Selah, *October 13, 2020*
21  *Selah    Council    Study    Session    and    Meeting*,    YOUTUBE,
22  https://www.youtube.com/watch?v=2AK9bsUtkw8    (at    1:54:00–2:09:40)
23  (Councilmembers Carlson and Vargas stating that the City did not start enforcing
24  the permit requirement until S.A.F.E.'s signs went up). While the City's regulation
25  does not "need to be the least restrictive or least intrusive means" of advancing the
26

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

legitimate interest, *Ward*, 491 U.S. at 798, it must bear some cognizable relationship to the City's purported interest in beautification in order to advance any such interest.

None of the other interests evinced in SMC 10.38 are compelling government interests. *See* SMC 10.38.020. The City's alleged aesthetic justification fails because it is undermined by allowed exceptions. The City advances no compelling interests through the Political Sign Regulation and cannot heal its unconstitutional activities by widening its interpretation and enforcement of them to be supposedly "content-neutral" by simply banning and removing all signs from public spaces.

e.    **The City Has Not Left Open Adequate Alternative Channels of Communication for Selah Residents**

The City has not left open ample alternative channels of communication for Selah residents, especially since the City has decided it is currently *not granting permits whatsoever* and thus *not allowing any signs in public right-of-ways*. *See* Cutler Decl. at ¶ 5.  Particularly during the COVID-19 pandemic, yard signs are an essential way to increase community awareness of S.A.F.E.'s mission since they are cost-effective and safe. *Cf. Collier*, 121 Wash. 2d at 760 ("[T]he yard sign was the most cost-effective, realistic method of increasing his name familiarity . . . . and can be localized to a high degree."). The Supreme Court has consistently "voiced particular concern with laws that foreclose an entire medium of expression[,]" regardless of the law's purported purpose. *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994); *see Perry Educ. Ass'n*, 460 U.S. at 465 (the government cannot "prohibit all communicative activity" in "quintessential public forums"). Yet that is exactly what the City has done. By prohibiting speech in public right-of-ways, Plaintiffs and all Selah residents have no other public forum to convey their messages using their signs.

Further, the City has eliminated other cost-effective public forums for

S.A.F.E. to convey its messages of racial justice, equality, and official accountability. S.A.F.E. attempted to use chalk art and chalk messaging to raise awareness; the City has been promptly erasing those chalk messages and even threatened to prosecute those who chalk on public property. Exs. K & L. S.A.F.E. also attempted to raise awareness at City Council meetings through public comments, but those City Council meetings were cancelled for periods of time, Ex. M, and City officials otherwise wholly censored S.A.F.E.'s comments. Callahan Decl. at ¶ 8. S.A.F.E.'s only current option to spread its message is through Facebook, which reaches only those who utilize social media and specifically search for "S.A.F.E." on Facebook. "A regulation fails to leave open ample alternative channels of communication if it 'effectively prevents a speaker from reaching [her] intended audience.'" *Dickinson v. Brown*, No. 17-cv-0868-RSL, 2017 WL 6623054, at *4 (W.D. Wash. Dec. 28, 2017), *aff'd*, 731 F. App'x 696 (9th Cir. 2018) (quoting *Edwards v. City of Coeur d'Alene*, 262 F.2d 856, 866 (9th Cir. 2001)). For these reasons, the Political Sign Regulation is unconstitutional.

### 2.    The Permit Process (SMC 10.38.040) is Unconstitutional

The Permit Process violates the First Amendment because it delegates excessive discretion to a public official. Time, place, and manner restrictions are only constitutionally permissible if they do not "delegate overly broad licensing discretion to a government official." *Battle v. City of Seattle*, 89 F. Supp. 3d 1092, 1098 (W.D. Wash. 2015) (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)). Broad discretion increases the risk that the official "will favor or disfavor speech based on its content." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) (citation omitted). The Permit Process prohibits any sign from being erected in the City (whether on public or private property) without a permit from the "building official," who is appointed by the Mayor of Selah. SMC 10.38.040; SMC

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –18

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

11.04.010; SMC 10.38.030. The Permit Process does not identify who the "building official" is, nor is it readily apparent from the Selah City website.[5]

Beyond designating a building official, the Permit Process contains no other criteria whatsoever. It does not provide any standards by which the building official will grant or deny a permit—not even discretionary standards. Nor does it require that the building official explain a permit denial. It contains no time limit for the building official's decision, no requirement that the denial be in writing, and no appeal process. In order to pass constitutional muster, a permit process must "contain adequate standards to guide [an] official's discretion and render it subject to effective judicial review." *Battle*, 89 F. Supp. 3d at 1099 (quoting *Thomas*, 534 U.S. at 323).

Nowhere does the Permit Process list criteria for when permits should and should not be issued. *C.f. Thomas*, 534 U.S. at 318–19 & n.1 (ordinance required officials to grant or deny permit and to deny permits only for enumerated reasons); *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1028 (9th Cir. 2006) ("'[T]he Community Events Committee *shall* issue' a permit if certain enumerated criteria are met."); *Kaahumanu v. Hawaii*, 682 F.3d 789, 804 (9th Cir. 2012) ("DNLR has no discretion to deny a registration if the applicant fills out the

---

[5] On information and belief, the building official is Jeff Peters. However, the Selah Website's "Sign Regulations" page does not list Jeff Peters. It instead directs individuals with questions to Selah's Code Enforcement Officer Erin Barnett. *See* Ex. N. When Plaintiff Whitlock contacted Ms. Barnett seeking a permit to post S.A.F.E.'s signs, Ms. Barnett told Plaintiff Whitlock that she had been instructed not to answer any of her questions—including how to apply for a permit. Whitlock Decl. at ¶¶ 15, 16, attach. A. Instead, Plaintiff Whitlock was redirected to Defendant Wayman, *id.*, who is not the "building official."

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –19

152263600.1
152339617.1

form and submits proof of insurance."). The Permit Process includes no criteria for granting or rejecting permit requests—assuming Selah citizens could submit requests at all.

Permits may also be unconstitutional where they require no explanation from the government official that denies the permit. *Oct. 22 Coalition to Stop Police Brutality v. City of Seattle*, 550 F.3d 788, 800, 802 (9th Cir. 2008) (explaining that one of the considerations leading to the Ninth Circuit invalidating a Seattle parade permit requirement was that it required no explanation of a decision to move a parade from a street to the sidewalk, thus leaving no "decision-making trail for [a court] to review"). The Permit Process does not require the building official to explain why a permit was denied.

The Permit Process also places no time limit on processing permit applications. Courts have considered this as another factor indicating unbridled discretion. *See Battle*, 89 F. Supp. 3d at 1104. *Cf. Thomas*, 534 U.S. at 318 (ordinance required officials to issue permit decision in 14 days, with an option for a 14–day extension with notice to applicant); *Long Beach Area Peace Network*, 574 F.3d at 1026 (permit scheme required 60 days advance notice for events not involving expressive activity, between three and ten days for expressive activities, and no permits at all for "spontaneous" expressive activity "occasioned by events coming into public knowledge within five days of the event"); *Santa Monica Food Not Bombs*, 450 F.3d at 1028 (ordinance "spell[ed] out the timing of the review process"); *Kaahumanu*, 682 F.3d at 804 (permits issued "immediately online" to registered applicants after payment of fee and submission of details). Unlike each of these cases, the building official here is under no time constraint to consider a permit application, even when the sign contains an event date or other time-sensitive information that the speakers wish to convey.

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

1    Given the "totality of the factors" above, the Permit Process does not contain

2  "adequate safeguards to protect against official abuse." *Battle*, 89 F. Supp. 3d at

3  1105 (citation omitted). The Permit Process provides unfettered discretion to a single

4  person—the "building official"—who is appointed by the Mayor of Selah. SMC

5  10.38.040; SMC 11.04.010; SMC 10.38.030. And official abuse has indeed occurred

6  here. The building officials' apparent ability to stop issuing permits altogether is

7  evidence that the lack of criteria allows the City to abuse its censorial power.

8    **3.    The Public Sign Ban (SMC 10.38.100) is Unconstitutional.**

9    As noted above, the City recently asserted that it will remove all signs from

10  public right-of-ways pursuant to its enforcement of the Public Sign Ban. Cutler Decl.

11  at ¶ 5. This is also unconstitutional. The Public Sign Ban states: "Freestanding signs

12  shall be located entirely on private property and no closer than two feet of the back

13  of curb line." SMC 10.38.100. A "freestanding sign" is "any sign supported by one

14  or more uprights, poles or braces in or upon the ground." SMC 10.38.030. The Public

15  Sign Ban is unconstitutional as-written because it regulates political speech,

16  regulates speech in a traditional public forum, fails to advance a compelling City

17  interest, and the City does not leave open alternative avenues for communication.

18    **a.    The Public Sign Ban Burdens Political Speech and Speech
       Regarding Matters of Public Importance.**

19

20    The Public Sign Ban burdens political speech and speech regarding matters of

21  public importance, including S.A.F.E.'s signs, because it flatly prohibits *all* signs

22  from Selah right-of-ways. SMC 10.38.100. Because of the heightened protection

23  afforded to such speech, the Public Sign Ban is subject to strict scrutiny, which

24  requires the City to prove that the restriction furthers a compelling interest and is

25  narrowly tailored to achieve that interest. *Citizens United*, 558 U.S. at 340; *Janus*,

26  138 S. Ct. at 2476; *Collier*, 121 Wash. 2d at 753.

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

### b.    Public Right-of-Ways are Traditional Public Forums

The Public Sign Ban does not define "public right of way." However, because Plaintiffs' signs meet the definition of freestanding signs and, as discussed above, have been placed in "parking strips"—the grassy space between the public road and the public sidewalk, Whitlock Decl. at ¶ 12, which are considered traditional public forums—the Public Sign Ban prohibits Plaintiffs from placing their signs in these traditional public forums. *Collier*, 121 Wash. 2d at 747 ("The parking strips in which Collier and his supporters placed his political signs lie between the 'street and sidewalks' and are thus part of the 'traditional public forum.'"); s*ee Bledsoe*, 2020 WL 376611 at *3 (streets and sidewalks are traditional pubic fora).

### c.    The Public Sign Ban is Not Narrowly Tailored to Advance a Compelling City Interest

The City must show that the Public Sign Ban furthers a compelling interest for it to survive constitutional scrutiny. "[R]estrictions [on speech in public forums] such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest." *United States v. Grace*, 461 U.S. 171, 177 (1983). The City now asserts that no freestanding signs are allowed in public right-of-ways, period. Cutler Decl. at ¶ 5. As written and as interpreted by the City, the regulation is exceedingly overbroad. This regulation prohibits temporary safety signs, commercial speech such as advertisements and business sandwich boards signaling to consumers that the business is open, yard signs advertising religious services, yard sale signs, and a whole host of otherwise protected speech. This is the very definition of an "absolute prohibition" on several types of expression and the City must therefore show a compelling interest.

It cannot.

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

1

2

3

4

5

6

7

8

9

10

11

     Nor can the City show that the Public Sign Ban is narrowly tailored to advance a compelling interest, even if any compelling interest did exist. As stated, while the City has a potentially "significant" interest in promoting aesthetics, aesthetics are not a "compelling" interest. *Collier*, 121 Wash. 2d at 754; *see also Reed*, 576 U.S. at 171–72. Further, the Public Sign Ban—and any purported interest in preserving City aesthetics—is fundamentally inconsistent with the City's sign ordinance stated purposes of "promot[ing] creative and innovative sign design" and "accommodate[ing] and promot[ing] sign placement consistent with the character and intent of the individual zoning districts." *See* SMC 10.38.020; *Kitsap County*, 153 Wash. 2d at 514. The Public Sign Ban does not accommodate or promote sign placement at all: it flatly prohibits sign placement in any public right-of-way.

12

13

### d.    The City Has Not Left Open Adequate Alternative Means for Communication

14

15

16

17

18

19

20

21

22

23

24

25

26

    The City has not left open alternative means for communication. As explained above, S.A.F.E.'s signs are an inexpensive and safe way to communicate its message. Whitlock Decl. at ¶ 7. The City has not left open areas nearby for S.A.F.E. to post its signs. Signs on private property are viewable, however, and this geographical reality favors individuals or entities that have the capital to buy or rent property on 1st Street. *See* Ex. P (photo taken from the perspective of the public sidewalk on 1st Street in Selah and showing a propane freestanding sign on private property) (00012). In addition, S.A.F.E. has been unable to spread its message using other safe and cost-effective ways, given the City's repeated efforts to wash away chalk art in support of racial equality, Exs. G, J, K, and the City's censoring of S.A.F.E. member comments submitted to be read on the record at City Council meetings. *See* Callahan Decl. at ¶ 8. Even though the City does not need to choose the "*least*-restrictive alternative," it may not select an option that unnecessarily

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –23

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

imposes significant burdens on First Amendment-protected speech." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 (9th Cir. 2011); *see Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last—not first—resort."). The Public Sign Ban restricts far more speech than necessary, and the City has not left open sufficient alternative means for communication.

**B.    Plaintiffs are Currently Suffering and Will Continue to Suffer Irreparable Harm Without a Preliminary Injunction.**

The second *Winter* factor requires a plaintiff to "demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). "Irreparable harm is relatively easy to establish in a First Amendment case." *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) (citation omitted). The Ninth Circuit and the Supreme Court have repeatedly held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (citations omitted).

Plaintiffs currently suffer and will continue to suffer irreparable harm absent a preliminary injunction. Signs in visible public areas are vital for Plaintiffs to spread their message of equity and inclusion to the larger Selah community. Whitlock Decl. at ¶¶ 7, 28; Davis Decl. ISO Pls.' Mot. Prelim. Inj. ("Davis Decl.") at ¶¶ 10, 11. Plaintiffs have also begun using their signs as a method to advertise community events that promote equity and inclusion, making visible and public sign placement even more crucial. *See* Whitlock Decl. at ¶ 11. The City, by continuing to take down these signs placed by Plaintiffs in traditional public forums, is unconstitutionally silencing Plaintiffs. *See id*. ¶¶ 14, 20. The loss of Plaintiffs' First Amendment

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

freedoms "unquestionably constitutes irreparable injury." And, because S.A.F.E.'s "First Amendment rights are being chilled daily, the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (citing *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012)).

The Ninth Circuit has consistently recognized the "significant public interest" in upholding free speech principles, as the "ongoing enforcement of the potentially unconstitutional regulations . . . would infringe not only the free expression interests of [plaintiffs], but also the interests of other people" subjected to the same restrictions. *Klein*, 584 F.3d at 1208. Here, even before the City's recent change in policy, the unequal enforcement of the City's sign regulations against S.A.F.E.'s signs had a broader effect on any individual or group who wished to communicate important political and ideological messages via temporary signs. This is even more true now under the City's new position: the City's new reliance on SMC 10.38.100 to justify its removal of *all* freestanding signs in public right-of-ways unconstitutionally silences the free speech rights of the entire Selah community on any subject. *See* Cutler Decl. at ¶ 5. Without a preliminary injunction, the City will continue—by its own admission—to remove all signs, including Plaintiffs' signs, in public right-of-ways, injuring Plaintiff and all citizens of Selah by unconstitutionally infringing upon their First Amendment freedoms. Immediate relief is necessary.

## C.    The Balance of Equities Tip Sharply Towards Plaintiffs

The third *Winter* factor requires this Court to "balance the interests of all parties and weigh the damage to each." *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) (citations omitted). Ordinarily, the party seeking an injunction need only show the injunction would "do

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –25

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Phone: 202.654.6200
Fax: 202.654.6211

more good than harm." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011) (citation omitted). But where a party has only shown serious questions concerning the merits of a claim, under the sliding scale variant of the *Winter* standard, the party must show the "balance of hardships tips *sharply* in [its] favor." *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (emphasis in original) (citation omitted).

Plaintiffs meet either standard. Because Plaintiffs have shown a likelihood of success on their free speech claims, the analysis is "straightforward" for the balance of equities, given the importance of protecting free speech. *See Klein*, 584 F.3d at 1208 (concluding that, for the same reason irreparable injury had been demonstrated, "[t]he balance of equities and the public interest thus tip sharply in favor of enjoining the ordinance").

The City will suffer no harm if Plaintiffs right to free speech is protected. Citizens of Selah have a longstanding tradition of posting signs of all kinds in the same locations where S.A.F.E.'s signs now stand—the City admittedly has only recently started enforcing SMC 10.38 in the manner that prompted this lawsuit, and subsequently this motion. *See* Whitlock Decl., Attach. C (stating that political signs did not need a permit to be on public property); Ex. L (letter from City Attorney stating that they would not remove S.A.F.E.'s signs or political candidate signs prior to the election); City of Selah, *October 13, 2020 Selah Council Study Session and Meeting*, YOUTUBE, https://www.youtube.com/watch?v=2AK9bsUtkw8 (at 1:54:00–2:09:40) (Councilmembers Carlson and Vargas stating that the City did not start enforcing the permit requirement until S.A.F.E.'s signs went up). Indeed, it surely benefits the City to save resources otherwise spent on public employees tasked with removing temporary signs every day.

Even in cases where the government has demonstrated hardship, "the balance

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –26

152263600.1
152339617.1

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

1    of equities favors [those] whose First Amendment rights are being chilled." *Doe v.*

2    *Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (determining that "there [would] be some

3    hardship on the State," in enjoining a California registration requirement that likely

4    violated the First Amendment since it had an interest in protecting the public from

5    crime, but concluding that the loss of Plaintiff's First Amendment rights was

6    greater). *Even if* the City's sign regulations effectively promoted the City's purported

7    interests in aesthetics, creative sign design, and reflecting different zoning districts

8    (they do not), these interests do not overcome the supreme state and federal

9    constitutional importance of protecting Plaintiffs' free speech rights.

10   **D.    A Preliminary Injunction is in the Public Interest**

11        The final *Winter* factor instructs that, if preliminary relief would "reach[]

12   beyond the parties, carrying with it a potential for public consequences[,]"

13   *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023–24 (9th Cir. 2016) (quoting

14   *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)), then the court must

15   consider whether preliminary relief is in the public interest. Here, preliminary relief

16   would both reach beyond the parties and be in the public interest.

17        "[I]t is always in the public interest to prevent the violation of a party's

18   constitutional rights." *American Beverage Ass'n v. City & Cty. of San Francisco*,

19   916 F.3d 749, 758 (9th Cir. 2019) (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002

20   (9th Cir. 2021)). Protecting free speech principles is "consistently recognized" as in

21   the public interest. *See American Beverage Ass'n*, 916 F.3d at 758. The harm being

22   inflicted on the Selah community by the City is twofold: first, potential S.A.F.E.

23   members, supporters, and others who would simply be positively impacted by

24   S.A.F.E.'s message of equality and inclusion are being shielded from that message,

25   *see* Davis Decl. at ¶¶ 10, 11, and second, all Selah residents' free speech rights are

26   now at stake. Preliminary relief would reach beyond the parties and be in the public

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –27

152263600.1
152339617.1

interest by putting a halt to the irreparable harm being inflicted by the City, which has increased its unconstitutional tactics to silence its citizens. Preliminary injunctive relief is in the public interest.

In sum, Plaintiffs are likely to succeed on the merits of their claims and continue to be injured by the removal of S.A.F.E.'s signs and silencing of their speech. The balance of equities and public interest both support preliminary relief, given that the entire City of Selah has now lost its right to speak on all matters through the use of freestanding signs in traditional public forums. There is a need for immediate injunctive relief without further delay. Trial will not occur for nearly a year. Plaintiffs (and the broader community of Selah) should not continue to suffer the deprivation of their freedom of speech in the meantime.

## E.    No Bond Should be Required.

Under Federal Rule of Civil Procedure 65(c), as a condition to issuance of a preliminary injunction, the Court must require the applicant to provide security "in an amount that the court considers proper to pay the costs and damages sustained by any party to found to have been wrongfully enjoined or restrained." As in this case, when the plaintiff is likely to prevail on the merits and there is no likelihood of harm to the defendant from issuance of a preliminary injunction, the Court has broad discretion to require no bond or other security. *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985). As demonstrated above, Plaintiffs are likely to succeed on their claims due to Defendants' continued and brazen violation of their First Amendment rights. No bond should be required.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion for preliminary injunction be granted.

A proposed order is filed herewith.

**Perkins Coie LLP**
700 Thirteenth Street, N.W., Suite 800
Washington, D.C.  20005-3960
Phone:  202.654.6200
Fax:  202.654.6211

1

2

DATED:  April 28, 2021

s/ Carolyn Gilbert
_____
Carolyn Gilbert, WSBA No. 51285

3

s/ Reina Almon-Griffin
_____

4

Reina Almon-Griffin, WSBA No. 54651

5

s/ Jane E. Carmody
_____
Jane E. Carmody, WSBA No. 55409

6

s/ Joseph P. Cutler
_____

7

Joseph P. Cutler, WSBA No.

8

s/ Roxanne Degens
_____
Roxanne Degens, WSBA No.

9

10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900

11

Seattle, WA  98101-3099
Telephone:  206.359.8000

12

Facsimile:  206.359.9000
JCutler@perkinscoie.com

13

CarolynGilbert@perkinscoie.com

14

RAlmon-Griffin@perkinscoie.com
JCarmody@perkinscoie.com

15

RDegens@perkinscoie.com

16

17

s/ Antoinette M. Davis
_____

18

Antoinette M. Davis, WSBA No. 29821

s/ Nancy Talner
_____

19

Nancy Talner, WSBA No. 11196

20

s/ Crystal Pardue
_____
Crystal Pardue, WSBA No. 54371

21

22

**American Civil Liberties Union of
Washington Foundation**

23

P.O. Box 2728

24

Seattle, WA 98111
Telephone:  206.624.2184

25

talner@aclu-wa.org

26

tdavis@aclu-wa.org
cpardue@aclu-wa.org

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –29

152263600.1
152339617.1

1

2
                                    *Attorneys for Plaintiffs*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which will effectuate service of a copy of such filing to the following counsel/parties of record:

***Attorneys for Defendants***
Christopher J. Kerley, WSBA No. 16489
**Evans, Craven & Lackie, P.S.**
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
Telephone:  509.455.5200
Facsimile:  509.455.3632
ckerley@ecl-law.com

D.R. (Rob) Case, WSBA No. 34313
**Larson Berg & Perkins PLLC**
105 North Third Street
Yakima, WA 98901
Telephone: 509.457.1515
Facsimile: 509.457.1027
Rob@LBPlaw.com

DATED this 28th day of April, 2021.

s/Reina Almon-Griffin, WSBA No. 54651
RAlmon-Griffin@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8015
Facsimile:  206.359.9015

MOTION FOR PRELIMINARY
INJUNCTION (No. 1:20-cv-03228) –31

152263600.1
152339617.1