CHRISTOPHER J. KERLEY, WSBA #16489
Evans, Craven & Lackie, P.S.
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
Telephone (509) 455-5200
Fax (509) 455-3632
ckerley@ecl-law.com
*Among Attorneys for Defendants*

D. R. (ROB) CASE, WSBA #34313
Larson Berg & Perkins PLLC
City of Selah
115 West Naches Avenue
Selah, WA 98942
Telephone (509) 698-7330
Rob.Case@selahwa.gov

*Among Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SELAH ALLIANCE FOR EQUALITY, COURTNEY HERNANDEZ, REV. DONALD DAVIS JR., LAURA PEREZ, ANITA CALLIHAN, KALAH JAMES, CHARLOTTE TOWN, AMANDA WATSON, and ANNA WHITLOCK, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF SELAH; SHERRY RAYMOND, in her official capacity as Mayor of the City of Selah; and DONALD WAYMAN, in his official capacity as City Administrator for the City of Selah, <br><br> Defendants. | Case No. 1:20-cv-3228 <br><br> DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 1

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

The City[1] responds as follows to Plaintiffs' Motion for Preliminary Injunction:

## I.    <u>INTRODUCTION</u>

The Plaintiffs' motion is almost entirely an attack on a straw man. Plaintiffs' factual recitations and legal arguments focus on the hallowed status of political speech under the First Amendment, the strict scrutiny applied to content-based laws regulating speech, the constitutionality of Selah's "political sign" ordinance (SMC 10.38.050), and actions taken by the City during the summer and fall of 2020 to enforce SMC 10.38.050 at a time the City believed the regulation was constitutional.  But last summer, after communicating with Plaintiffs' counsel and examining *Reed v. Town of Gilbert*, 576 US 155 (2015), the City conceded SMC 10.38.050 is facially unconstitutional and ceased enforcing it.  Consistent with this concession, Defendants admitted in their Answer to Plaintiffs' Complaint that SMC 10.38.050 is facially unconstitutional, and the City is in the process of amending its sign regulations to eliminate SMC 10.38.050.  Given this, the constitutionality of SMC 10.38.050 is moot (see discussion of mootness, *infra*) and, to the extent Plaintiffs seek a preliminary injunction relative to SMC 10.38.050, Plaintiffs' motion should be denied.

The City <u>is</u> enforcing its sign regulation that prohibits all free-standing signs, regardless of message or content, in the public right-of-way. (SMC 10.38.100).    Thus, the relatively narrow issue before the court is the constitutionality of that provision.

---

[1] Throughout this brief, unless otherwise indicated, Defendants are referred to collectively as "the City".

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 2

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

Because SMC 10.38.100 is content-neutral, advances significant City governmental interests, and leaves Plaintiffs ample alternative channels for communicating their message and beliefs, the regulation passes First Amendment muster. Thus, to the extent Plaintiffs' motion asks the court to prohibit the City from removing all free-standing signs, including Plaintiffs', from the public right-of-way, the motion should be denied.[2]

## II.    FACTS

### A.    Genesis and root cause of dispute between Plaintiffs and the City

The tensions that underlie this lawsuit germinated in June of 2020, in the wake of George Floyd's death and subsequent Black Lives Matter (BLM) demonstrations that occurred in Portland, Seattle and other parts of the country. On June 6, 2020, outside BLM members or supporters, joined by a much smaller number of Selah residents, brought BLM's message and methods to Selah in the form of a march. Decl. of Donald Wayman, pp. 4-6, p. 8, ll. 18-20. At that event, Selah City Administrator Donald Wayman was approached by a woman he did not recognize, and who did not identify herself. Decl. of Donald Wayman, p. 8, ll. 18-20. Mr. Wayman later learned the person was Holly Cousens, the Assistant Mayor of the City of Yakima. Decl. of Donald Wayman, p. 8, ll. 19-20, p. 9, ll. 1-2. Ms. Cousens asked Mr. Wayman what his personal opinions were of the BLM march. Id.

---

[2] Based on the breadth of their statement of facts and supporting declarations, one might assume Plaintiffs are mounting a selective enforcement and "as applied" challenge to the City's sign regulations. However, in a footnote to their brief on page 10, Plaintiffs concede that, in requesting preliminary injunctive relief, they are bringing only a facial challenge. Thus, the issue before the court is whether that portion of the SMC sign regulations prohibiting free-standing signs on the public right-of-way – SMC 10.38.100 – is facially constitutional.

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - Page 3

By this point, Mr. Wayman had done a significant amount of research on BLM as a movement. Decl. of Donald Wayman, p. 9, ll. 1-3. Mr. Wayman learned through his research that BLM's national organizers, including Patrisse Cullors, had described herself as a "trained Marxist", and that BLM's stated policy objectives included disruption of the American nuclear family in favor of an all-powerful central government. Decl. of Donald Wayman, p. 9, ll. 1-6. Mr. Wayman, a retired marine colonel who spent much of his military career responding to insurgencies overseas, also could not help but notice similarities between the BLM movement in the USA and totalitarian movements in foreign nations that he had directly witnessed. Decl. of Donald Wayman, p. 9, ll. 2-10.

Mr. Wayman heard the marchers in Selah on June 6, 2020 shouting "No justice, no peace!", presumably in reference to the death of George Floyd. Decl. of Donald Wayman, p. 9, ll. 11-12. Mr. Wayman found this perplexing, in his position as City Administrator, given that Selah had never had any problems with brutality or racism by its police force. Mr. Wayman observed that the marchers included several school-aged children, who seemed to be mindlessly parroting slogans fed to them by adults. Decl. of Donald Wayman, p. 9, ll. 11-12.

When Ms. Cousens asked for Mr. Wayman's personal opinion, he opined that the march looked reminiscent of a communist indoctrination effort. Decl. of Donald Wayman, p. 9, ll. 17-20. This was Mr. Wayman, as a citizen, voicing his personal opinion on some of the tenants and methods of BLM as an organization.

Unfortunately, Ms. Cousens posted a distorted account of Mr. Wayman's comments on Facebook. Decl. of Donald Wayman, p. 10, ll. 7-8. Among other things, Ms. Cousens implied that Mr. Wayman had threatened her and the marchers with a concealed weapon, which was a fabrication. Declaration of Donald Wayman, p. 10, ll. 7-9.

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 4

The reaction of BLM and its supporters to Ms. Cousens' Facebook post was swift and predictable. Because Mr. Wayman had the audacity to criticize BLM as a movement, and voice his disapproval of some of its beliefs and methods, he was vilified and attacked. See Declaration of Donald Wayman, pp. 11-12. Some or all of the Plaintiffs were part of that effort, which continues.[3]

If one theme emerges from the preliminary injunction record, it is that Plaintiffs' activities in Selah since June 6, 2020 have been motivated in very large part by an intense animus toward Mr. Wayman.

## B.    Plaintiffs' Other Activities in Selah

Not all of the activities of the Plaintiffs and/or their supporters in Selah have been the peaceful advancement of "equity and inclusion." The messages that Plaintiffs and/or their supporters chalked on Selah streets and sidewalks were often vicious personal attacks against Mr. Wayman and other members of the City's workforce, including the Mayor, the City attorney, and the Selah Police

---

[3] In the wake of Ms. Cousens' Facebook post, the Plaintiffs and/or their supporters wrote letters, emails and on-line posts, demanding that Mr. Wayman be summarily fired. They slandered Mr. Wayman as a supposed pedophile, via flyer-style signs they placed on light posts and via messages throughout the City. Declaration of Donald Wayman, p. 11, ll. 10-20. Mr. Wayman regularly experienced hang-up calls and threatening messages on his office telephone. Id. Suspicious packages and items began appearing on the front porch of Mr. Wayman's private residence. Individuals created at least two websites assailing Mr. Wayman personally and trying to get him fired. Id. The City's official Facebook page was filled with inflammatory comments and efforts to generate a lawsuit, to the point it had to be de-activated. Declaration of Donald Wayman, p. 12, ll. 1-2. In response to this de-activation, someone created imposter Facebook pages for the City and the Selah Police Department, and used those pages to spread disinformation and divisive rhetoric. Declaration of Donald Wayman, p. 12, ll. 1-4. When Mr. Wayman traveled after hours to an event at a park in Yakima, he was met by uninvited individuals who chalked the ground with hateful messages and eavesdropped on the entire event. Declaration of Donald Wayman, p. 12, ll. 2-6.

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 5

Evans, Craven & Lackie, P.S.
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

Department.  Declaration of Donald Wayman, p. 12, ll. 7-13.  In addition to drawing chalk penises and sexually insulting images, individuals wrote chalk comments such as "Fuck SPD", "SPD is guilty", and "SPD is racist, sexist, homophobic, transphobic".  Declaration of Donald Wayman, p. 12, ll. 7-17.

### C.    Plaintiffs' BLM "Demands" to City

On June 15, 2020, approximately one week after the first march in Selah, Plaintiffs delivered a written list of "demands" to the Mayor.  Declaration of Donald Wayman, p. 12, l. 20, p. 13. Ll. 1-4.  The Plaintiffs' list was labeled "Selah Black Lives Matter Protestor Demands".  Declaration of Donald Wayman, p. 13, ll. 5-6.  Among other things, the Plaintiffs demanded "re-direction of [Selah's] police funding towards other agencies" "removal of any 'Selah' police presence from school grounds.", Declaration of Donald Wayman, p. 13, ll. 5-10, "re-naming a major city street after Martin Luther King, Jr." and making "investments in community social services, education, after-school programs, mental health services, [and] housing".  Declaration of Donald Wayman, p. 13, ll. 5-12.

### D.    City's Reaction to Plaintiffs' "Demands" and Subsequent Protests in front of Mayor's Restaurant

The Mayor, Sherry Raymond, did not submit to the Plaintiffs' tactics or demands.  Instead, on June 17, 2020, she issued a "Proclamation" that recognized residents' right to lawfully engage in free speech, stated the City's policy of not discriminating against political rallies or against rally attendees based on their views, affirmed the City's support of Mr. Wayman as City Administrator, and emphasized the importance of black people and all human life.  Declaration of Donald Wayman, p. 13, ll. 16-17, p. 14, ll. 1-16.

When the Mayor did not fire Mr. Wayman as the Plaintiffs demanded, Plaintiffs and/or their supporters set about trying to disrupt the Mayor's local

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 6

restaurant, King's Row.  Declaration of Donald Wayman, p. 15, ll. 1-2.  They repeatedly protested in front of the restaurant, and sometimes on the business grounds. Id.  They shouted at customers, called the Mayor vicious things (such as pedophile protector), and spread other lies and hatred.  Declaration of Donald Wayman, p. 15, ll. 2-5.[4]

### E.    Plaintiffs' Additional Demand to City

In July and August 2020, the Plaintiffs, this time through their attorneys, issued more demands to the City.  Declaration of Donald Wayman, p. 16, ll. 3-4. Mr. Wayman, the Mayor, and the City Attorney, Rob Case, had an in-person meeting at City Hall with attorneys from the Perkins-Coie firm.  Declaration of Donald Wayman, p. 16, ll. 5-13.  In addition to demanding that the City forever allow the Plaintiffs to draw in the middle of City streets, the attorneys insisted that the City establish and fund a non-profit corporation to help the Plaintiffs organize and advocate.  Id.  In effect, they demanded the City set up something similar to the S.A.F.E. group.  Id.  Mr. Wayman, the Mayor, and the City Attorney regarded that demand as completely unrealistic, similar to the Plaintiffs' defund-the-police demands, because the City cannot expend taxpayer funds to benefit any particular advocacy group.  Id.

### F.    Actions/Statements of the City Relative to Chalk Marking

After Plaintiffs and/or Plaintiffs' supporters began marking City streets and sidewalks with chalk, the City, initially through its Chief of Police and later via

---

[4] Plaintiffs and/or their supporters have also attacked the City Attorney, Rob Case.  On Facebook, individuals accused Mr. Case of stalking women and little girls throughout town and said that the Selah Police Department had supposedly "confirmed" that he had done so.  Declaration of Donald Wayman, p. 15, ll. 7-10.  See also Declaration of D. R. "Rob" Case.

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 7

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

the City Attorney, issued multiple letters articulating the City's position that chalking City streets and sidewalks constituted criminal mischief under RCW 9A.48.090(1)(b). Declaration of Donald Wayman, p. 16, ll. 16-18. While the Plaintiffs claim the City, in those letters "threatened to criminally prosecute the individuals for said chalk", ECF 029, p. 7, ll. 18-19, p. 18, 3-4, in reality the City Attorney's June 30, 2020 letter was much softer. Therein, the City Attorney stated the City had not prosecuted anyone, had merely warned individuals, and that the City did not desire to prosecute anyone over chalk writing and marking. The City Attorney went on to indicate that the City would consider the matter closed so long as Perkins-Coie's clients (the Plaintiffs) did not again create unauthorized graffiti on public property. Declaration of Donald Wayman, p. 17, ll. 1-9.

In response to the City Attorney's June 30th letter, the Plaintiffs amplified their efforts. They continued chalking City streets and sidewalks, and began chalking City buildings such as City Hall and the Municipal Courthouse. Declaration of Donald Wayman, p. 17, ll. 10-12. On one occasion in mid-2020, a future S.A.F.E. member used aerosol-based spray chalk on a City sidewalk in front of the Civic Center to create a Soviet-style hammer and sickle and write "Black Lives Matter". Declaration of Donald Wayman, p. 17, ll. 10-14, p. 18, l. 1. Aerosol-based spray chalk is similar to spray paint, and to remove that "drawing" City workers had to sandblast the sidewalk and apply a new concrete skim coat. Declaration of Donald Wayman, p. 18, ll. 1-3.

In an effort to reach a compromise, the City Attorney, on July 16, 2020, issued a letter to Plaintiffs' attorneys at Perkins-Coie. Declaration of Donald Wayman, p. 18, ll. 4-8. The letter advised the Plaintiffs that the usage of traditional stick chalk on City sidewalks/walkways would be allowed, but that the City would

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 8

not permit the Plaintiffs to use aerosol-based spray chalk or to write on City buildings.  Id.

Significantly, the City has not prosecuted anyone for chalking or marking City property.  Declaration of Donald Wayman, p. 18, ll. 9-10.  Rather, the City has only pled with the Plaintiffs to comply with the law and to tone down their methods and tactics.  Declaration of Donald Wayman, p. 18, ll. 9-11.

### G.   Actions of City Relative to Enforcement of City Sign Regulations

#### 1.   "Political" Sign Ordinance – SMC 10.38.050

At times, during the summer of 2020, the City removed a small number of the Plaintiffs' signs from public property because of the City's belief in the constitutionality of SMC 10.38.050, addressing "political" signs.  Declaration of Donald Wayman, p. 21, ll. 16-19.  But in October 2020, Plaintiffs' attorney challenged the facial constitutionality of SMC 10.38.050, calling the City's attention to *Reed v. City of Gilbert*.  The City reevaluated its position on the constitutionality of SMC 10.38.050, and came to the conclusion that, based on *Reed*, the regulation was, indeed, facially unconstitutional.  Declaration of Donald Wayman, p. 19, ll. 11-20. In the wake of that determination, the City took no action against the Plaintiffs' signs throughout the remainder of the fall 2020 political season, and the Plaintiffs' signs were allowed to exist unattended on City-owned rights-of-way alongside true political signs.  Declaration of Donald Wayman, p. 21, 15-20, p. 22, ll. 1-3.

#### 2.   Free-standing signs on public right-of-way-SMC 10.38.100

After the Plaintiffs filed their Complaint (in December 2020), Plaintiffs resumed placing signs in public rights-of-way.  Declaration of Donald Wayman,

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 9

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

p. 22, ll. 7-8.  This began in early 2021, long after the fall of 2020 political season had ended.  Declaration of Donald Wayman, p. 22, ll. 8-9.

SMC 10.38.100 prohibits all free-standing signs in public rights-of-way. Declaration of Donald Wayman, p. 23, ll. 1-5.  The City's executive branch of government has a legal obligation to enforce its municipal laws, including the sign regulations.  Declaration of Donald Wayman, p. 23, ll. 17-20.  Accordingly, City employees, including Mr. Wayman, removed, and continue to remove those signs from the public right-of-way.

Plaintiffs claim that, until recently, the City, in practice, allowed "free-standing signs" in public rights-of-way.  See ECF 029, p. 2, ll. 23-24.  But the City has never allowed free-standing signs on public rights-of-way (other than true political signs during political seasons under the now known to be unconstitutional SMC 10.38.050, and the Plaintiffs' signs during the fall 2020 campaign season). Declaration of Donald Wayman, p. 29, ll. 3-7.  Mr. Wayman has been the City Administrator for six years, and throughout those years any free-standing signs discovered in public rights-of-way have been removed by the City with reasonable promptness.  Declaration of Donald Wayman, p. 29, ll. 7-9.  While Mr. Wayman has personally removed some of those signs over the years, more commonly the removal is done by City Public Works personnel.  Declaration of Donald Wayman, p. 29, ll. 7-12.

Action spreadsheets spanning from 2016 through the present, attached as Exhibit A to the declaration of City Code Enforcement Officer Erin Barnett, document many the occasions when she or another City employee removed (or required a citizen to remove) unlawful free-standing signs.  Declaration of Donald Wayman, p. 30, 1-5.  Declaration of Erin Barnett, Exhibit A.  And, contrary to Plaintiffs' claims of unequal enforcement (see e.g. ECF 029, p. 2, l. 24), the City's

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 10

enforcement vis-à-vis unlawful free-standing signs has been uniform throughout the years. Declaration of Donald Wayman, p. 30, ll. 5-7. Regardless of message or messenger, the City removes unlawful free-standing signs from public rights-of-way. Declaration of Donald Wayman, p. 30, ll. 7-14.

With respect to Plaintiffs' express or implied assertion that the City's removal of free-standing signs from the public right-of-way has been inconsistent and sporadic, City personnel are not required to become, and cannot become omnipresent. Declaration of Donald Wayman, p. 33, ll. 6-10. The City is not required to prevent violations before they occur, whether the violation is of a speed limit or a sign regulation. Id. At most, the City is required to act within a reasonable time of discovering a violation and having an opportunity to respond. Id. And that is precisely what the City does. Id.

The City's Code Enforcement Officer does not work on weekends. Declaration of Donald Wayman, p. 33, ll. 11-20. Thus, if an unlawful sign is placed on a Friday evening or during the weekend – as the Plaintiffs have repeatedly done – the earliest the Code Enforcement Officer can act on those signs is the following Monday morning (if the signs have not already been removed by the Plaintiffs or third-parties.) Declaration of Donald Wayman, p. 33, ll. 11-15. On occasion Mr. Wayman has encountered unlawful free-standing signs during a weekend and has removed them, rather than allowing the violation to persist until Monday morning. Declaration of Donald Wayman, p. 33, ll. 15-18. But he is not always in town on weekends, and when he is in town on the weekends he does not examine every public right-of-way. Declaration of Donald Wayman, p. 33, 15-20.

In light of the above, it is possible that unlawful free-standing signs placed at certain times, such as on a weekend, a weekday night, or when the Code

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
- Page 11

Enforcement Officer is on vacation or consumed with other matters, might remain standing longer than signs placed at other times. Declaration of Donald Wayman, p. 34, ll. 3-6. But that does not negate the City's responsibility to enforce SMC 10.38.100, or render it unconstitutional. Declaration of Donald Wayman, p. 34, ll. 5-7.

With regard to Plaintiffs' claim that the City's removal of free-standing signs from the public right-of-way has been selective or discriminatory, the City has removed, and continues to remove, all signs from the public right-of-way when it discovers them, including signs posted by a group called "FALSE". Declaration of Donald Wayman, p. 35, ll. 16-20, p. 36, ll. 1-20, p. 37, ll. 1-9. See also Declaration of Donald Wayman, p. 37, ll. 10-16.

Plaintiffs claim that the "parking strips" along Selah's two main thoroughfares (i.e. First Street/Highway 823 and Jim Cements Way/Highway 823) are traditional public fora in Selah. ECF 029, p. 12, ll. 24, p. 13, ll. 13. But free-standing signs have never been allowed on parking strips in Selah – which exist on public rights-of-way. Declaration of Donald Wayman, p. 38, ll. 11-12. That is because of SMC 10.38.100, which expressly prohibits free-standing signs on public rights-of-way, including, but not limited to parking strips. Declaration of Donald Wayman, p. 38, ll. 11-14.

Selah's parking strips, which, again, exist on public rights-of-way, are designed as vegetation beds, and the only structures the City has ever allowed within the parking strips are overhead light posts and official government signs, such as traffic signs. Declaration of Donald Wayman, p. 38, 19-20, p. 39, l.1. The City's Public Works personnel devote considerable time each week to maintaining the parking strips to enhance aesthetics. And allowing free-standing signs to be posted in the parking strips detracts from aesthetics, interferes with watering and

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
- Page 12

mowing, impedes the view of drivers on the street, potentially adversely impacts adjacent businesses, and tend to obscure vehicle ingress and egress locations.  See recitation of City's reasons for prohibiting free-standing signs in parking strips, set forth in the Declaration of Donald Wayman on pages 39 through 45.

## III.    ARGUMENT AND AUTHORITY

### A.    Preliminary Injunction Standard(s)

To obtain a preliminary injunction, a plaintiff must demonstrate that "(1) [he] is likely to succeed on the merits of [his] claim; (2) [he] is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of hardships in [his] favor; and (4) a preliminary injunction is in the public interest."  *Int'l Franchise Ass'n. Inc., v. City of Seattle*, 803 F.3d 389, 399 (9th Circ. 2015, *citing Winter v. NRDC Inc., 555 US 7, 20, 129 S. Cet. 365, 172 L.Ed. 2d 249 (2008)*. Whether the plaintiff is likely to succeed on the merits is a threshold inquiry. "[W]hen 'a plaintiff has failed to show the likelihood of success on the merits [the court] need not consider the remaining three *Winter* elements.'"  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Circ. 2015, quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris)* 729 F.3d 937, 944 (9th Circ. 2013).

Preliminary injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter, supra,* at 22, *citing Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L.Ed. 2d 162 (1997).  In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter, supra*, at 24, quoting *Amoco Production Co*, 480 U.S. 531, 542, 107 S. Ct. 1396, 94 L.Ed. 2d 542 (1987).

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

As "an extraordinary and drastic remedy", *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Circ. 2012) *citing Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997), a preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *Id*.

A preliminary injunction can be either prohibitory or mandatory. A prohibitory injunction "prohibits a party from taking action" preserving the *status quo* until the action is decided on the merits. *Marlyn Nutroceuticals Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Circ. 2009). On the other hand, a mandatory injunction orders a party to act in a way that goes beyond maintenance of the *status quo* and "is particularly disfavored." *Id*. at 879. Mandatory injunctions are generally not granted unless "extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation and damages." *Id*.

The 9th Circuit employs a "sliding scale" approach to preliminary injunctions. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Circ. 2011). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may off-set a weaker showing of another." *Id*.

**B.    Mootness of Plaintiffs' Motion Relative to SMC 10.38.050**

A trial court may properly deny a motion for preliminary injunction if the issue is moot. "A case becomes moot when it has 'lost its character as a present, live controversy.'" *Idaho Rivers United v. Hudson*, 173 F.Supp.3d 1027, 1031 (D Idaho 2016), partially quoting *Oregon v. FREC*, 636 F.3d 1203, 1206 (9th Circ. 2011).

"[T]he repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal." *Board of*

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 14

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

*Trustees of the Glazing Health and Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Circ. 2019).

While voluntary cessation of alleged illegal conduct does not automatically deprive the tribunal of power to hear and determine a case, see *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979), an issue is moot if the defendant demonstrates that the challenged conduct cannot reasonably be expected to reoccur. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222, 120 S. Ct. 722, 145 L. Ed. 2d 650 (2000). A change in administrative policy that accepts a plaintiff's free speech arguments renders the claim moot. See, e.g. *White v. Lee*, 227 F.3d 1214, 1242-44 (9th Circ. 2000).

In the instant case, the City has conceded that its "political" sign regulation, SMC 10.38.050 is facially unconstitutional, and has even admitted that in its Answer. Thus, the constitutionality of that provision is moot, and, to the extent Plaintiffs' motion for preliminary injunction relates to the constitutionality of that provision, it should be denied.

C. **Application of *Winter* Factors**

1. **Plaintiffs are unlikely to succeed on the merits because the sign regulation that the City is currently enforcing – SMC 10.38.100 - is content-neutral, advances legitimate, significant City interests, and leaves the Plaintiffs ample alternative means of expressing their message and beliefs.**

In *Reed v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218, 192 L. Ed. 2 236 (2015), the court addressed the constitutionality of a city sign ordinance that included numerous content-based restrictions and exclusions, including restrictions for "ideological signs[s]" and "political sign[s]". 576 U S. at 159-160. In holding that the ordinance violated the First Amendment because the provisions

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 15

of the sign code at issue were clearly content-based, the court said this about a content-neutral prohibition against signs on public property:

> The town has ample content-neutral options available to resolve problems with safety and aesthetics. For example, its current code regulates many aspects of signs that have nothing to do with the sign's message:  size, building materials, lighting, moving parts, and portability. (Code citation omitted.)  <u>And on public property, the town may go a long way toward entirely forbidding the posting of signs, so long as it does so in an even-handed, content-neutral manner</u>.  See *Taxpayers for Vincent*, 466 U.S. at 817, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (upholding-neutral ban against posting signs on public property). (emphasis added)
>
> 576 U.S. at 173.

The 9th Circuit has recognized and followed this guidance from *Reed* regarding the content-neutral prohibition of signs.  In *Lonestar Sec. and Video, Inc. v. City of L.A.*, 827 F.3d 1192 (2016) the court considered the constitutionality of city ordinances regulating mobile billboards.  After finding that the regulations at issue were content-neutral, the court held that the regulations survived First Amendment scrutiny because they were narrowly tailored to advance a significant government interest, and the ordinances left open adequate alternative opportunities for expression.  On the significant government interest issue, the court observed:

> The Supreme Court and this court have repeatedly confirmed that local governments may exercise their police powers to advance these goals [traffic control, public safety, and aesthetics] by prohibiting intrusive or slightly forms of expression.  See *Taxpayers for Vincent*,

DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - Page 16

466 U.S. at 808; *GK, Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1072-73 (9th Circ. 2006). Instead, we focus on whether the mobile billboard regulations are narrowly tailored to the city's interest.

827 F.3d at 1200.

On the significant government interest of eliminating visual blight and promoting aesthetics, the court stated:

> None of the ordinances in this case are "substantially broader than necessary" to accomplish the city's goals of eliminating visual blight and promoting the safe and convenient flow of traffic. <u>Controlling case law compels our conclusion that the city's interest in aesthetics alone justifies the ordinances</u>. See *Taxpayers for Vincent*, 466 U.S. at 808 (holding that a total restriction on a certain type of visual advertising is narrowly tailored because, by banning the type of signs that the city determined to constitute "visual clutter and blight," the city "did no more than eliminate the exact source of evil it sought to remedy"). Under this binding precedent, it is therefore enough that the appellees believe that the advertising displays prohibited by the mobile billboard regulations detract from the city's overall appearance; the outright ban directly serves this stated interest." (emphasis added)

827 F.3d at 1201.

Here, the provision of the SMC relating to "free-standing signs" which the City is enforcing against <u>all</u> signs located in the public right-of-way is content-neutral and narrowly tailored to accomplish the City's goals of eliminating visual blight, and promoting aesthetics, business development and success, and traffic safety.

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 17

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

On the alternatives for expression issue, the *Lonestar* court recognized that, to satisfy the First Amendment, a time, place, and manner regulation must "leave open ample alternative channels for communication."  827 F.3d at 1201, quoting *Clark v. Comty. For Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984).  In holding that the ordinances at issue did that, the court stated:

> [T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.  *Heffron v. Int'l Society for Krishna Consciousness Inc.*, 452 U.S. 640, 647, 1010 S. Ct. 2559, 69 L. Ed. 2d 298 (1981).  However, a restriction on expressive may be invalid if the remaining modes of communication are inadequate.  *Taxpayers for Vincent*, 466 U.S. at 812.

> The mobile billboard ordinances leave open adequate alternative opportunities for advertising.  The challenged regulations foreclose only one form of expression – mobile billboards – by placing limited restrictions on the types of vehicles to which those mobile billboards may be affixed for any vehicles whose primary purpose is something other than advertising and the manner in which billboard advertisements can be displayed on a motor vehicle (in a permanent fashion and no larger than the dimensions of the vehicle). <u>Appellants are free to disseminate their messages through myriad other channels, such as stationary billboards, bus benches, flyers, newspapers, or handbills.  Appellants may also paint signs on vehicles and attach decals or bumper stickers.</u>  Although mobile billboards are a unique mode of communication, nothing in the record suggests that appellants' over-all "ability to communicate effectively is threatened." *Taxpayers for Vincent*, 466 U.S. at 812. (emphasis added)

827 F.3d at 1201.

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 18

Here, a free-standing sign placed in the City right-of-way is not the only way an individual or organization can convey a message, political or otherwise, in the City of Selah.  The Plaintiffs and others are free to express their ideas through marches, signs, banners, speeches, press conferences and chalk marking, and Plaintiffs have done all of that in Selah.  They are also free to communicate their ideas on social media, and Plaintiffs have done that as well.  Indeed, the portion of S.A.F.E.'s Facebook page which is open to the public boasts that S.A.F.E. has 680 members, and the page includes a detailed recitation of S.A.F.E.'s political beliefs, aspirations, motives, and objectives.  See Exhibit A to Declaration of Christopher J. Kerley.  In sum, because the City's facially-neutral free-standing sign regulation leaves open adequate alternative opportunities for Plaintiffs and others to convey their ideas and messages, the regulation does not violate the First Amendment.[5]

### 2.  Irreparable Harm

The loss of First Amendment rights, where the plaintiff is likely to succeed on the merits, constitutes irreparable harm.  See *Klein v. City of San Clemente*, 684 F.3d 1196, 1207-08 (9th Circ. 2009).  However, where the plaintiff has ample alternative means of conveying his message, the court is free to give this factor

---

[5] Following *Reed, supra,* courts from other circuits have held that content-neutral ordinances or regulations prohibiting or regulating signs on public property do not violate the First Amendment.  See e.g., *Constr. And Gen. Laborers Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120 (7th Circ. 2018); *Constr. And Gen. Laborers Local Union No. 330 v. Town of Grand Chute*, 297 F.Supp.3d 850 (ED Wisc. 2018); *Signs for Jesus v. Town of Penbroke*, 977 F.3d 93 (1st Circ. 2020); *Berg v. Vill. of Scarsdale*, 2020 _WL_6749825 (SDNY 2020).  See also *Act Not to Stop War and End Racism Coal. v. District of Columbia*, 846 F.3d 391 (DC Circ. 2017).

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 19

"minimal weight" in applying the *Winter* four-part test.  See e.g. *Tracy Rifle and Pistol LLC v. Harris*, 118 F.Supp.3d 1182, 1193 (ED Cal 2015).

Here, Plaintiffs are unlikely to succeed on the merits for the reasons set forth above.  In addition, because Plaintiffs have ample alternative means of conveying their message in the City of Selah, this factor should be given only minimal weight, and it does not tip the scales of equity in favor of a preliminary injunction.

### 3.  Balance of Hardships

Again, the Plaintiffs have multiple alternative means of conveying their message in the City of Selah other than posting free-standing signs in the City rights-of-way.  And, for all of the reasons set forth in the Declaration of Donald Wayman, allowing the posting of free-standing signs in the City rights-of-way by the Plaintiffs or anyone else would present multiple hardships and issues for the City, including blight, litter, interference with mowing, water and other maintenance, interfering with traffic, and potentially frustrating the success of businesses, particularly those located adjacent to parking strips.

### 4.  Public Interest

As recognized by the Supreme Court in *Reed*, *supra*, and by lower courts in other cases, particularly *Lonestar, supra*, cities have a significant public interest in promoting government interests such as those identified above.  While certainly speech on political issues/issues of public concern is a freedom to be protected, it is not absolute.  And, in this case, because Plaintiffs and others who wish to express/convey a political message in the City of Selah have ample ways to do so other than posting free-standing signs in the public rights-of-way, the City's interests outweigh First Amendment concerns in this situation.

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 20

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

1
2
3

### IV.   <u>CONCLUSION</u>

Based on the foregoing argument and authorities, the City respectfully requests that Plaintiffs' Motion for Preliminary Injunction be denied.

DATED this 12th day of May, 2021.

EVANS, CRAVEN & LACKIE, P.S.

By: /s/   *Christopher J. Kerley*
CHRISTOPHER J. KERLEY, WSBA #16489
ckerley@ecl-law.com
*Among Attorneys for Defendants*

By: /s/ *D.R. Case*
D. R. (ROB) CASE, WSBA #34313
City of Selah
115 West Naches Avenue
Selah, WA 98942
Telephone (509) 698-7330
Rob.Case@selahwa.gov
*Among Attorneys for Defendants*

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 21

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

# CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System which will effectuate service of a copy of such filing to the following counsel/parties of record:

| *Attorneys for Plaintiffs* | *Email Addresses:* |
|---|---|
| PERKINS COIE LLP | |
| 1201 Third Avenue, Suite 4900 | |
| Seattle, WA 98101-3099 | |
| Telephone: 206.359.8000 | |
| Facsimile: 206.359.9000 | |
| | |
| Carolyn Gilbert, WSBA No. 51285 | JCutler@perkinscoie.com |
| Joseph P. Cutler, WSBA No. 37234 | CarolynGilbert@perkinscoie.com |
| Reina Almon-Griffin, WSBA No. 54651 | RAlmon-Griffin@perkinscoie.com |
| Jane E. Carmody, WSBA No. 55409 | JCarmody@perkinscoie.com |

*Co-Counsel and Attorneys for Plaintiffs*
American Civil Liberties Union
Washington Foundation
P.O. Box 2728
Seattle, WA 98111
Telephone: 206.624.2181

Antoinette M. Davis, WSBA No. 29281       Talner@aclu-wa.org
Nancy Talner, WSBA No. 11196              tdavis@aclu-wa.org
Crystal Pardue, WSBA No. 54371            cpardue@aclu-wa.org

DATED this 12th day of May, 2021.

EVANS CRAVEN & LACKIE, P.S.

By _____s/ Christopher J. Kerley_____
CHRISTOPHER J. KERLEY, WSBA #16489

DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
- Page 22